**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Bernard MORTIMER, Defendant-Appellant.**

**No. 14706.**

United States Court of Appeals Seventh Circuit.

March 23, 1965.

Rehearing Denied April 29, 1965.

John F. Kelly, Daniel A. Taylor, Jr., Chicago, Ill., for defendant-appellant, Taylor & Kelly, Chicago, Ill., of counsel.

Edward V. Hanrahan, U. S. Atty., Chicago, Ill., for plaintiff-appellee, John Peter Lulinski, John Powers Crowley, Asst. U. S. Attys., of counsel.

Before SCHNACKENBERG and CASTLE, Circuit Judges and MERCER, District Judge.

SCHNACKENBERG, Circuit Judge.

Bernard Mortimer, defendant, has appealed from a judgment of the district court finding him guilty on a four-count indictment, charging him with willfully and knowingly attempting to evade a large part of income tax due and owing by him and his wife to the United States of America for the years 1957 to 1960 inclusive, under which judgment he was committed for imprisonment for a period of six months on each count, the sentences to run consecutively, and he was fined $1250 on each of said counts, cumulatively, and costs.

There was evidence tending to prove the facts which we now state.

Defendant is a physician and surgeon, who, during the taxable years, practiced from an office in Joliet, Illinois. His office work was done by Miss Shea, a nurse. Defendant showed her his records, which consisted of a daily log book and patients' account cards, referred to in the record also as ledger cards. The log book was designed to show for each day a list of the patients, the amount charged each patient, and the amount paid by each patient on that day. The purpose of a patient's account card was to show the charges due and the amounts paid by each patient, posted from the log book. Miss Shea kept these records during the years involved. The defendant instructed her to enter all receipts in the daily log book and to post from the daily log book to the patients' account cards.

Defendant testified that the receipts in the log book were totaled and he used the amounts so determined as the receipts from his practice as shown on his income tax returns. He further testified that he made a rough computation based on the number of deliveries he made since that was the primary source of his fees.

With defendant's consent, revenue agents Smith and Chau examined the log book for 1958. He was not able to find the log books for the other years. The agents were also shown a drawer containing patients' account cards. Defendant instructed his nurse to make the records available to the agents. They were unable to find account cards for some of the names written in the log book. They also noted that there were account cards on which there were entries of payments during the year 1958 that did not appear in the log book. Moreover, there was evidence showing defendant's course of conduct which resulted in some payments of $100 or over being omitted from the 1958 log book.

Smith prepared lists of names of patients for whom he had not observed account cards and gave them to the defendant or his nurse. Additional account cards were given to the agents as the doctor or his nurse found them. Smith testified that defendant told him that he never got around to systematically destroying old cards, that all the cards that he had were in the file, that there were no other records anywhere, and that those that were not in the file were destroyed as obsolete or were lost.

There was evidence that on March 27, 1962, Mrs. Lega, who had replaced Miss Shea, stated to Smith that she had found some cards in a file cabinet in the closet. This "bundle of cards" she gave to Smith and on March 30, 1962, when he telephoned defendant, he was told that defendant had found more cards, 309 of which cards defendant gave to Smith by April 12, 1962.

On May 3, 1962, Smith told defendant that he had found many cards since defendant showed the agents "this supposedly inactive file" and defendant said "What do you mean, supposedly inactive file?" Defendant stated he had given the agents all the cards he had and that he had no other file. On May 11, 1962, defendant told Smith that he had not found any more cards in his office. Smith then told defendant he "had found 862 cards in his hidden file" and defendant told Smith he resented the agent's implication that he was dishonest.

On May 14, 1962, Smith called defendant and asked if he had found the cards which Smith had asked about. Defendant said he had some cards and that Smith could come in and observe them. Smith went to defendant's office and found 42 cards on defendant's desk, 33 of which had entries on them for the years 1957 through 1960. Smith testified that these were the last cards he received from defendant's office.

The agents during their examination transcribed payments from 1590 patients' account cards to individual sheets for each patient. These transcriptions were separated into two groups, first, account cards obtained from the file drawer in defendant's private office, and cards given to him by defendant or his nurse from lists prepared by Smith, during the period from September 5, 1961 to March 30, 1962, and, second, transcriptions of account cards given to Smith after March 30, 1962.

The total amounts derived as patient receipts by the agents from their examination of defendant's account cards, as compared with the receipts reported on defendant's income tax returns for the years involved, and the differences for each year are as follows:

| Year | Receipts Per Account Cards | Receipts Per Returns | Difference |
|------|------|------|------|
| 1957 | $45,630.17 | $30,875.00 | $14,755.17 |
| 1958 | 44,305.90 | 29,616.00 | 14,689.90 |
| 1959 | 46,261.25 | 27,773.00 | 18,488.25 |
| 1960 | 43,778.10 | 29,046.99 | 14,731.11 [1] |

1. These figures are quoted from defendant's brief and have not been questioned by the government.

———◆———

Defendant had a checking account for his practice in the Union National Bank and Trust Company of Joliet and a personal checking account at the First National Bank of Joliet. Defendant testified that the deposits made in the checking account for his practice were to cover his office expenses.

Defendant purchased money orders at the Union National Bank and Trust Company in the following aggregate amounts:

| | |
|------|------|
| 1957 | $24,037.80 |
| 1958 | 62,487.29 |
| 1959 | 28,976.57 |
| 1960 | 36,763.18 |

The bank is located in the same building as is defendant's office. Defendant testified that for the purchase of money orders he used checks and cash received by him from his patients, checks and cash received by his wife from her patients, and cash that he and his wife had accumulated in prior years. He also used a check in the amount of $4,856.63, which he received from an insurance company for storm damage, to purchase a money order. The money orders were used to pay personal obligations, to make charitable contributions, to purchase securities, and to purchase a Stradivarius violin at a cost of $20,000 which defendant presented anonymously to a concert violinist for his use.

A substantial number of checks issued to defendant by his patients were negotiated at the draft cage of the Union National Bank and Trust Company and were not deposited by defendant. At that cage, money orders, cashier's checks and the like were issued.

Defendant argues in this court that, while the records evidenced the understatement of income for the years involved, the record in this case fails to show any evidence that the defendant knew, or any evidence upon which it could be inferred defendant knew, that his nurse had not faithfully followed his instructions. Thus, defendant contends that there has been a failure of proof shown beyond a reasonable doubt of willfulness and specific intent on the part of defendant to commit the offense charged against him in the indictment.

■ However, we hold, that the evidence viewed in the light most favorable to the government, supports the conviction of defendant. The evidence pertaining to the various records in defendant's office, to which we have alluded at some length, and the attitude and statements of defendant when the investigating agents were attempting to ascertain the facts pertaining to his tax liability, when considered against his consistent pattern of substantially understating his income by approximately 40% over a period of four years, are sufficient conduct on the part of defendant to demonstrate his consciousness of guilt and constitute proof of willfulness.

Defendant contends that, under the circumstances of this case, defendant's course of conduct in purchasing bank money orders lacks probative value sufficient to carry the government's burden to prove willfulness beyond a reasonable doubt. With this we do not agree.

We find that the district court did not erroneously restrict the cross-examination of Miss Shea when called as a government witness.

■ Finally, as reversible error, defendant points to the refusal to admit in evidence a money order payable to the Internal Revenue Service on account of defendant's 1960 tax or as a payment on his 1961 declaration. While it is not entirely clear that the district court did not err in this respect, it must be remembered that the trial was by the court, without a jury, and that there is abundant other evidence in the record to support the finding and judgment below. Hence, if a mistake was made in this respect, it was not prejudicial to defendant.

For these reasons the judgment from which this appeal has been taken is affirmed.

Judgment affirmed.

CASTLE, Circuit Judge (concurring).

Miss Shea, testifying as a government witness, stated that she was employed by the defendant from April 1954 until December 1961, and that among her duties was bookkeeping. She identified the types of records she kept, including the daily log book and the account cards, and described the office procedure, including her receipt of the payments by the patients in person or through the mail, and her entries in the records. On cross-examination she was asked: "In all the years you worked for Dr. Mortimer, Miss Shea, did Dr. Mortimer ever so much as once ask you to post directly to the ledger cards or deliberately omit any

kind of financial information?" The court sustained the government's objection and ruled the question was not within the scope of the direct examination.

The subject matter of the office nurse's direct examination concerned office procedure, the posting of payments received from patients, and instructions given her by the defendant. The question asked was well within that subject matter. The court improperly refused to permit the witness to answer. But, as Judge Schnackenberg points out, the trial was to the court and there is abundant evidence to support the court's finding and judgment. On the facts and circumstances presented by this record the error neither requires nor warrants a reversal.